# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS AUSTIN DIVISION

GREGORIO OLIVARES GUTIERREZ,

*Plaintiff,*

v.

DR. PRABHAS V. MOGHE, in his individual capacity and his official capacity as President of the University of Texas at Dallas, DR. GENE FITCH, in his individual capacity, and DR. AMANDA SMITH, in her official capacity as Interim Vice President for Student Affairs and Dean of Students of the University of Texas at Dallas,

JOHN M. ZERWAS, M.D., in his official capacity as Chancellor of the University of Texas System, and

KEVIN P. ELTIFE, JANIECE LONGORIA, JAMES C. "RAD" WEAVER, CHRISTINA MELTON CRAIN, ROBERT P. GAUNTT, JODIE LEE JILES, NOLAN PEREZ, M.D., STUART W. STEDMAN, and KELCY L. WARREN, in their official capacities as members of the Board of Regents of the University of Texas System,

*Defendants.*

Case No. 1:26-cv-2546

**VERIFIED ORIGINAL COMPLAINT**

**Jury Trial Demanded**

## Introduction

1. The University of Texas at Dallas, a public university, punished one of its undergraduate students for practicing journalism. That action violates the First and Fourteenth Amendments to the United States Constitution and must be enjoined.

2. Plaintiff Gregorio Olivares Gutierrez, a member of the university's student newspaper and ultimately the publication's editor-in-chief, reported on protests, free speech,

policing, the university's connections to the Epstein files, and other matters the administration did not like or want covered. That coverage made Gutierrez a target.

3. Later, when Gutierrez reviewed a letter to the editor and required its author to substantiate factual claims, as standard journalistic practice requires, the university employed its powers not legitimately, to protect free expression, but unlawfully, to silence it.

4. Thus, the university used the author's complaint against Gutierrez as a pretext, "investigated" Gutierrez, and sanctioned him.

5. Gutierrez brings this action to vindicate his constitutional rights. He seeks to stop Defendants' efforts to retaliate against him for exercising those rights. And he asks the Court to intervene to protect his rights to report, edit, and speak without fear of punishment by the government.

## Parties

*Plaintiff*

6. Gregorio Olivares Gutierrez is a student at the University of Texas at Dallas ("UTD"). He is a resident of Dallas, Texas and was a resident there at all relevant times.

*Defendants*

7. The Board of Regents of the University of Texas System is a governmental entity under the laws of the State of Texas and is the governing body for the University of Texas System and its member institutions, including the University of Texas at Dallas. *See* TEX. EDUC. CODE § 65.02. The Board is based in Austin, Texas, and regularly convenes there to discuss UT System business.

8. Kevin P. Eltife, sued in his official capacity, is a member of and serves as Chairman of the Board of Regents of the University of Texas System.

9. Janiece Longoria, sued in her official capacity, is a member of and serves as Vice Chairman of the Board of Regents of the University of Texas System.

10. James C. "Rad" Weaver, sued in his official capacity, is a member of and serves as Vice Chairman of the Board of Regents of the University of Texas System.

11. Christina Melton Crain, Robert P. Gauntt, Jodie Lee Jiles, Nolan Perez, M.D., Stuart W. Stedman, and Kelcy L. Warren are members of the Board of Regents of the University of Texas System.[1] They are sued in their official capacities.

12. Texas law authorizes the Regents "to govern, operate, support, and maintain each of the component institutions that are now or may hereafter be included in a part of The University of Texas System," which includes UTD. *Id.* § 65.31(a); *see id.* § 65.11.

13. Texas law also authorizes the Regents "to promulgate and enforce such other rules and regulations for the operation, control, and management of the university system and the component institutions thereof as [they] may deem either necessary or desirable." *Id.* § 65.31(c); *see id.* § 70.04 (specifically related to UTD).

14. John M. Zerwas, M.D., is Chancellor of the University of Texas System. Chancellor Zerwas is the chief executive officer of the UT System and reports to the Regents. He is directly responsible for all aspects of the UT System's operations. *See id.* § 65.16(c); UNIV. OF TEX. SYS. BD. OF REGENTS R. 20101.

[1] Jeremiah Shelby Clarke is a student regent for the UT System, but lacks voting power and "is not a member of the board of regents of the system for which the student is appointed." *See* TEX. EDUC. CODE § 51.355(e). Thus, he is not named as a Board of Regents defendant.

15. The Regents exercise their power and authorities through Chancellor Zerwas. As part of his duties, Chancellor Zerwas is responsible for implementing the Regents' policies, purposes, and goals. He also directs the management and administration of all UT System institutions, including UTD.

16. Defendants Zerwas, Eltife, Longoria, Weaver, Crain, Gauntt, Jiles, Perez, Stedman, and Warren are collectively referred to as the "UT System Board Defendants."

17. Dr. Prabhas V. Moghe, sued in his individual and official capacities, is the president of UTD, a member institution of the University of Texas System. President Moghe is the chief executive officer of UTD with "general authority and responsibility for the administration of that institution." UNIV. OF TEX. SYS. BD. OF REGENTS R. 20201, § 4. This includes developing and administering policies "for the program, organization, and operation of the institution," "policies relating to students," and "rules and regulations for the governance of the institution." *Id.* §§ 4.1, .3, .9.

18. Dr. Gene Fitch, sued in his individual capacity, was the Vice President of Student Affairs of UTD, a member institution of the University of Texas System. As Vice President of Student Affairs, Dr. Fitch was the ultimate decisionmaker concerning student discipline and the application of the Student Code of Conduct. *See* UTDSP5003, Student Code of Conduct, § G, subsec. 20. UTD's Student Code of Conduct was developed "in accordance with The University of Texas System (UT System) model policy" "[p]ursuant to the Regent Rules." *Id.* at § A, subsec. 1.1; *see* Univ. of Tex. Sys. Bd. of Regents R. 50101, § 2.2, .5.

19. Dr. Amanda Smith, sued in her official capacity, is the Interim Vice President of Student Affairs and the Dean of Students of UTD, a member institution of the University of Texas

System. As Dean of Students, Dr. Smith is "responsible for the administration of the disciplinary process" under UTD's Student Code of Conduct. *See* UTDSP5003, Student Code of Conduct, § A, subsec. 3.1.2 (June 1, 2020). As Interim Vice President of Student Affairs,[2] Dr. Smith is the ultimate decisionmaker concerning student discipline and the application of the Student Code of Conduct. *See id.* at § G, subsec. 20.

20. The UT System Board Defendants exercise or exercised direct supervisory authority over President Moghe, Dr. Fitch, and Dr. Smith. The Regents select the president of each member institution, each serving "at the pleasure of the Chancellor, subject to the approval of the Board of Regents." UNIV. OF TEX. SYS. BD. OF REGENTS R. 20101, §§1, 3. President Moghe hires and fires the vice presidents and deans of UTD, *see id.* at 20102, § 2.1.1, but any such decision may be reversed by the Regents, *see* TEX. EDUC. CODE §§ 51.352(g), 65.32. Through that structure, the Regents can direct Chancellor Zerwas to intervene in, review, or countermand decisions made by President Moghe, Dr. Fitch, or Dr. Smith, including decisions implementing or enforcing the policies challenged here.

21. At all relevant times, each Defendant acted under color of state law.

## Jurisdiction and Venue

22. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action raises federal questions under the First and Fourteenth Amendments of the United States Constitution through 42 U.S.C. § 1983.

23. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1343(a)(3) because Gutierrez commenced this action to redress the deprivation of his constitutional rights.

[2] Upon Dr. Fitch's retirement, Dr. Smith became the Interim Vice President for Student Affairs.

24. Venue in this Court is proper under 28 U.S.C. § 1391(b)(1) because at least one Defendant resides in this district and all Defendants are residents of Texas.

## Factual Allegations

*Gutierrez and The Mercury*

25. In fall 2023, Gutierrez joined The Mercury, UTD's student newspaper, as a staff writer. By December, he had become a student editor; by summer 2024, he had risen to editor-in-chief, assuming responsibility for the publication's editorial judgment and standards.

26. As a staff member, Gutierrez covered current events and newsworthy matters. Not every subject welcomed the scrutiny, and UTD was no exception.

27. Gutierrez's reporting repeatedly cast UTD in an unfavorable light. He covered matters of public concern—campus speech, student protests, university administration, campus policing, student government, discrimination, sexual assault, and infrastructure failures.

28. In December 2023, for instance, Gutierrez published an article criticizing UTD's removal of the "Spirit Rocks"—a campus space long used for political and community expression—as damaging to campus culture and potentially unconstitutional.

29. In April and May 2024, Gutierrez and other journalists for The Mercury reported on pro-Palestine campus protests, the May 1 encampment, the law-enforcement raid, student and faculty arrests, the detention of protesters, and UTD's response. By July 2024, Gutierrez had published an Editor's Desk article addressing critical journalism and editorial standards in coverage touching Israel, Palestine, and university policy.

30. Gutierrez's work earned acclaim from the College Media Association, the Associated Collegiate Press, the Texas Intercollegiate Press Association, the Society of Professional Journalists, and the Student Press Law Center.

31. By summer 2024, Gutierrez's reporting had made him a persistent thorn in UTD's side—especially to Student Affairs officials whose decisions affected students and student media. The administration found his journalism inconvenient.

*The Steinberg Letter to the Editor*

32. On July 31, 2024, UTD student Jonathan "Jade" Steinberg submitted a Letter to the Editor (the "LTTE") to The Mercury for publication.

33. Under the Mercury Policy Compendium—the policies and procedures governing The Mercury as approved by its editorial board—the staff may make minor grammar and syntax corrections and provide edits and commentary as suggestions to the author. The compendium also recognized that, as a public forum, The Mercury could not engage in viewpoint discrimination when publishing Letters to the Editor—but it preserved the publication's discretion to decline publication. And the compendium additionally required authors to provide sourcing for factual assertions.

34. Upon receiving the LTTE, The Mercury staff began its review and editing process.

35. Steinberg, the president of the Student Hillel Board, was a visible figure on UTD's campus. They[3] are an outspoken advocate against antisemitism and in favor of Israel. The LTTE, titled "Campus antisemitism," mentioned antisemitism at UTD but focused primarily on Zionism and the Israel–Palestine conflict.

[3] Steinberg's preferred pronouns are they/them.

36. On August 4, 2024, Steinberg followed up with The Mercury about their piece. Gutierrez, as editor-in-chief, responded that The Mercury had selected the LTTE for publication and would edit it the next day.

37. On August 5, 2024, Gutierrez returned the LTTE to Steinberg with suggested edits and feedback. After reviewing and editing the LTTE himself, Gutierrez provided approximately two dozen comments, including challenges to source credibility and requests for additional sourcing to support factual assertions. As Gutierrez explained—consistent with the compendium—even a Letter to the Editor required standard editorial sourcing and fact-checking for factual claims, not just firsthand personal experience.

38. The feedback served critical purposes. For one thing, The Mercury was subject to the same laws and bound by the same journalistic standards as any reputable publication. Publishing a piece without proper sourcing would not only violate those standards—it could expose The Mercury to legal liability. Moreover, journalistic practice required assertions of fact to withstand source vetting; otherwise, The Mercury might publish unverified, unsubstantiated writing, thereby transforming a journalistic publication into the comments section of a Facebook post.

39. On August 7, 2024, Steinberg submitted a revised version of the LTTE and thanked Gutierrez for his edits. The next day, The Mercury's managing editor provided a second round of feedback—mostly non-substantive suggestions, but also requests for additional sourcing and support for suggestions Gutierrez had made and Steinberg had not addressed.

40. Days later, Steinberg rejected many of the proposed edits and suggestions, including direct requests for sources supporting the LTTE's factual assertions.

41. Steinberg's refusal put The Mercury in a bind. The LTTE addressed a salient public issue—one Gutierrez believed was vital to campus discourse after recent campus events. But Steinberg's decision not to substantiate the LTTE's factual claims pushed the submission to the outermost boundary of what The Mercury could publish.

42. Ultimately, Gutierrez concluded that more voices were better than fewer. The Mercury published the LTTE in full on August 19, 2024, without altering Steinberg's final submission.

43. To uphold journalistic standards and provide readers with appropriate context, The Mercury added a disclaimer at the top of the LTTE. It read: "The information presented within this letter to the editor is the opinion of the author and should not be treated as news. On June 12, a UN commission found Israel guilty of 'crimes against humanity of extermination, gender persecution targeting Palestinian men and boys, murder, forcible transfer, and torture and inhuman and cruel treatment.' The presentation of opinion as fact within this article, despite repeated requests to address the issue, does not meet the journalistic standards of The Mercury." The disclaimer included a link to the referenced U.N. report.

44. The disclaimer is factually correct: the LTTE is not news. A U.N. commission made the finding as represented. The LTTE presents opinions as fact. Repeated requests to address that issue were made, and Steinberg elected not to address that issue—just as they had elected to submit the LTTE for publication in the first place.

45. The next day, Steinberg filed an incident report with UTD's Office of Institutional Compliance, alleging that Gutierrez had discriminated against Steinberg by providing editorial feedback and adding the disclaimer.

*UTD Retaliates Against Gutierrez Through Pretextual Investigation*

46. UTD seized on Steinberg's complaint, using it as a pretext to silence Gutierrez for his prior reporting on the administration. It immediately escalated the complaint into the student-conduct disciplinary process.

47. On September 13, 2024—before even notifying Gutierrez of the investigation—UTD removed him from The Mercury. His removal triggered a staff strike, which led UTD to remove the striking students as well.

48. UTD did not inform Gutierrez of the investigation until October 15, 2024—two full months after Steinberg filed the complaint and a full month after UTD had removed him from The Mercury.

49. Between his removal from The Mercury and UTD's notice of the investigation, Gutierrez and the other removed student journalists founded The Retrograde, a nonprofit newspaper registered in Texas. On October 14, 2024, The Retrograde published Gutierrez's news article, "North Texas neo-Nazis spread hate at UTD." The article covered far-right groups in North Texas and their advocacy at UTD, most recently through stickers. It included commentary from university officials on relevant policy and featured student leaders who argued that the university was not doing enough.

50. Gutierrez met with UTD officials on October 16, submitted a written response on October 21, and sat for an interview on October 29.

51. On April 29, 2025, UTD sent proposed findings to the parties for review and comment. In those findings, UTD had concluded that Gutierrez discriminated against Steinberg.

The Office of Community Standards and Conduct and the Dean of Students received the final proposed findings on June 10, 2025.

52. In a November 12, 2025 letter to Gutierrez, a UTD administrator stated that, in "[his] belief," Gutierrez had violated applicable university rules and would be subjected to a two-year deferred suspension and an education sanction grounded in media ethics. Embracing a guilty-until-proven-innocent approach, the letter provided Gutierrez three paths forward: (1) decline to dispute the facts, accept responsibility, and accept the sanctions; (2) decline to dispute the facts, accept responsibility, but appeal the sanctions; or (3) dispute the facts and "NOT accept responsibility for the violation."

53. After reviewing UTD's letter and identifying its constitutional deficiencies, the Foundation for Individual Rights and Expression ("FIRE") wrote to UTD, detailing the illegality of the university's actions and demanding it rescind the suspension. *See* Letter from FIRE to Prabhas V. Moghe (Nov. 19, 2025), https://www.fire.org/research-learn/fire-letter-university-texas-dallas-november-19-2025.

54. Facing public scrutiny, UTD reversed course. Rather than impose the suspension outright, it scheduled a disciplinary hearing before "neutral" adjudicators to hear evidence and testimony.

55. The resulting proceeding, held in February 2026, was not an adjudication—it was a reckoning with a predetermined outcome. The "neutral" adjudicators were attorneys from a law firm paid by the hour to represent public universities, including UTD. UTD permitted Gutierrez an advisor, but the advisor could not speak or participate in the proceedings. Until just before the

hearing, Gutierrez knew only that he had been accused of discrimination against Steinberg in connection with the LTTE; UTD kept the substance of the investigation hidden.

56. Only then did Gutierrez learn that UTD was not accusing him of religious discrimination—as Steinberg's complaint and the entire pre-hearing process had suggested. Instead, the university alleged *national-origin* discrimination. Gutierrez was surprised: Steinberg is an American.

57. UTD advanced the following theory: Steinberg is an adherent of the Jewish faith. Because the ancestral homeland of the Jewish people is the modern state of Israel, UTD asserted, Gutierrez's actions therefore implicated Steinberg's ancestry—allowing UTD to bring national-origin discrimination charges via Title VI, which covers national origin but not religion. *See* 42 U.S.C. § 2000d.

58. The hearing made the pretext plain.

59. When questioned, Steinberg made clear that they felt discriminated against based on their religion—not because of their geopolitical position on Israel. And Steinberg offered no evidence of discrimination beyond their own subjective belief.

60. When asked to identify proof of discrimination, the university's investigator said she had compared the number of hyperlinks in other pieces published by The Mercury with those in the published LTTE. She also stated that the published drafts contained a similar number of hyperlinks and that the edits left for Steinberg were "unwelcome." From that, she concluded that Gutierrez had discriminated by giving Steinberg too much feedback—an unsubstantiated and illogical conclusion in any context.

61. When asked why she had concluded that Gutierrez discriminated, the investigator said any reasonable person would have perceived his actions as discriminatory. Asked what she meant by "reasonable person," she identified only Steinberg—*the complainant.*

62. Gutierrez reiterated what he had maintained throughout the investigation: The Mercury weighed the LTTE's questionable sourcing against the importance of its subject matter to campus discourse and decided to publish it with appropriate context, enabling readers to assess the issues for themselves.

*UTD Punishes Gutierrez for Exercising His Constitutional Rights*

63. UTD did not let the opportunity pass. A month after the hearing, it found that Gutierrez had discriminated against Steinberg through an editing process that "exceeded ordinary editorial suggestions." The panel relied on two grounds: (1) Steinberg's subjective perception of discrimination and (2) a comparison with two other opinion articles.

64. The panel then concluded—incredibly—that Gutierrez could have avoided discrimination by declining to publish the LTTE, publishing it without commentary, or using what the panel called a "neutral" editor's note.

65. UTD's action was plain: It converted editorial judgment into a finding of actionable harassment and held Gutierrez responsible under both the university's Nondiscrimination Policy and Student Code of Conduct.

66. The panel imposed a two-year deferred suspension and an education sanction grounded in media ethics. The sanction required Gutierrez to complete a Nondiscrimination Policy module and a Media Ethics & Governance course and submit a seven-to-ten-page reflective paper,

all by November 20, 2026. Meanwhile, the deferred suspension hung a sword of Damocles over Gutierrez's head—a threat designed to chill him into silence for the rest of his time at UTD.

67. Gutierrez appealed. The decision was affirmed and remains in effect.

68. While the proverbial sword may be hanging, UTD plainly seeks to drop it on Gutierrez's head.

69. In recent months, Gutierrez published an article about the off-campus doxxing of protesters from UTD's Palestinian protests, quoting public statements by Steinberg. Steinberg responded with another discrimination complaint—this time based on the article in which Gutierrez quotes a statement Steinberg made publicly on Instagram.

70. UTD again elevated Steinberg's complaint to the student-conduct disciplinary process. Gutierrez now faces another investigation for exercising his First Amendment rights. If found guilty of "doing journalism" again, his deferred suspension would automatically take effect.

**Gutierrez's Injury**

71. Gutierrez realleges and incorporates the foregoing factual allegations as if set forth fully herein.

72. Defendants' conduct has caused Gutierrez injury by chilling his speech and other activity protected by the First Amendment.

73. Gutierrez reasonably fears, and continues to fear, discipline by UTD for exercising his First Amendment right as a journalist and member of the UTD student body.

74. UTD has no license to deprive Gutierrez of his constitutional rights or education because he engaged in First Amendment activity that the university subjectively deemed unfavorable or objectionable. *See Shelton v. Tucker*, 364 U.S. 479, 487 (1960) ("The vigilant

protection of constitutional freedoms is nowhere more vital than in the community of American schools.").

75. Through discipline—including educational courses and forced reflective writing—UTD is attempting to impose a state-preferred perspective on a matter of public concern because Gutierrez exercised his First Amendment rights. That effort violates Gutierrez's constitutional safeguards. *See Chiles v. Salazar*, 607 U.S. 627, 655 (2026) ("[T]he First Amendment stands as a shield against any effort to enforce orthodoxy in thought or speech in this country. It reflects instead a judgment that every American possesses an inalienable right to think and speak freely, and a faith in the free marketplace of ideas as the best means for discovering truth.").

76. By imposing deferred suspension, UTD uses an age-old method of state-sponsored speech inhibition—an ever-looming threat of investigation and further discipline if Gutierrez again "steps out of line" by engaging in free speech. The suspension is designed to chill his speech, to make him think twice before engaging in journalism UTD may disfavor. It is the quintessential sword of Damocles: suspension or expulsion hangs over Gutierrez's head, ready to fall should he express anything UTD does not like. *See First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 192 (2026) ("The value of a sword of Damocles is that it hangs—not that it drops." (brackets and citation omitted)).

77. Defendants continue to injure Gutierrez by chilling his speech and other First Amendment activity. As described above, UTD is again investigating him for engaging in expressive activity.

78. Defendants' actions are a direct and proximate cause of Gutierrez's reasonable fear of discipline for engaging in constitutionally protected activities.

79. Fifth Circuit precedent makes clear that official-capacity defendants need only have "some connection" with enforcement of the challenged act, and an injury need only be "fairly traceable" to that defendant; the injury need not be directly caused by the defendant. *See Jackson v. Wright*, 82 F.4th 362, 367–68 (5th Cir. 2023). The UT System Board Defendants' governing authority over the Regents' Rules, the Student Code of Conduct, and the officials who enforced those policies against Gutierrez makes his injuries fairly traceable to them. Their authority to direct or countermand the relevant decisions and to amend the governing rules further connects the ongoing sanctions and threatened discipline to the UT System Board Defendants.

## Causes of Action

### COUNT ONE
### Violation of the First and Fourteenth Amendments
### As-Applied Challenge Free-Speech Violation (42 U.S.C. § 1983)
### Against the UT System Board Defendants, Moghe, and Smith

80. Gutierrez realleges and incorporates the foregoing factual allegations as if set forth fully herein.

81. The First Amendment protects an individual's right to free expression. It applies "regardless of whether the government considers [the] speech sensible and well intentioned or deeply 'misguided,'" *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023), and especially when the government "disapprov[es] of the ideas expressed," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

82. The First Amendment's aegis extends to state-university campuses. *Widmar v. Vincent*, 454 U.S. 263, 268–69 (1981); *see Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

83. Gutierrez engages in protected expression when he publishes written work in journalistic publications such as The Mercury and The Retrograde. He does so as an author, editor, and steward of those publications.

84. By approving the disclaimer's inclusion in the LTTE, Gutierrez engaged in expression protected by the First Amendment.

85. UTD then investigated whether Gutierrez had discriminated against the LTTE's author.

86. After investigating Gutierrez and conducting a disciplinary hearing, UTD sanctioned him with, among other penalties, a deferred suspension for approving the disclaimer's inclusion in the LTTE.

87. The inclusion of the disclaimer was protected expression under the First Amendment. UTD punished Gutierrez for that expression, thereby depriving him of constitutional rights.

88. Gutierrez specifically challenges the application of two policies: UTDBP3090 and § C, subsec. 9.6.15 of the Student Code of Conduct. The former "prohibits unlawful discrimination against a person because of their race, color, religion, sex (including pregnancy), sexual orientation, gender identity, gender expression, national origin, age, disability, genetic information, or veteran status," while the latter states: "Any student who engages in conduct that violates the Regents' Rules and Regulations, University rules and regulations, specific instructions issued by an administrative official of the institution or the UT System acting in the course of their authorized duties, or federal, State, or local laws is subject to discipline. A student is subject to discipline for prohibited conduct that occurs on or off campus, including but not limited to University or UT

System sponsored off-campus activities such as field trips, internships, rotations, study abroad, or clinical assignments, regardless of whether civil or criminal penalties are also imposed for such conduct." Defendants sanctioned Gutierrez for national-origin-based harassment, which violates UTDBP3090, which in turn violates § C, subsec. 9.6.15 of the Student Code of Conduct.

89. Additionally, the UT System Board Defendants knew or should have known of the constitutional violations and failed to act. Section 3 of the Regents' Rules requires subordinate officials to report significant matters to the Board—including matters that may substantially affect the institution's reputation. Gutierrez's case received widespread public attention and media coverage. FIRE also wrote to UTD, detailing the constitutional defects and demanding rescission of the suspension. The UT System Board Defendants therefore knew or should have known of the ongoing violations. Yet they did nothing to restrain or reverse their subordinates' actions.

90. As a legal consequence of the UT System Board Defendants, Moghe, and Smith's violation of Gutierrez's First and Fourteenth Amendment rights, which are per se irreparable injuries, Gutierrez is entitled to judgment, declaratory relief, injunctive relief, and the reasonable costs of this action, including reasonable attorney's fees.

## COUNT TWO
### Violation of the First and Fourteenth Amendments
### As-Applied Challenge Free-Speech Violation (42 U.S.C. § 1983)
### Against the UT System Board Defendants, Moghe, and Smith

91. Gutierrez realleges and incorporates the foregoing factual allegations as if set forth fully herein.

92. The First Amendment proscribes the government from abridging free speech, but it "need not permit all forms of speech on property that it owns and controls." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992). The standard governing limitations on

an individual's "right of access to public property" depends on "the character of the property at issue." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 44 (1983).

93. The Mercury was UTD's official student newspaper. *See* Student Media Bylaws, § 2.1(a) (Oct. 29, 2025), https://retrogradenews.com/wp-content/uploads/2026/04/FINAL-102925.smbylaws.pdf. Accordingly, to determine the First Amendment scrutiny applicable to The Mercury, the nature of the "forum" must be identified.

94. The Mercury is a limited public forum. UTD opened The Mercury to "provide an opportunity for students to exercise Constitutionally protected freedom of the press and speech while simultaneously providing students an opportunity to develop skills and professional experience in communication and related fields." UTDPP1124, Committee on Student Media at 1 (Apr. 9, 2025); *see Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2001) (identifying limited public forums as "forums opened for public expression of particular kinds or by particular groups").

95. Because The Mercury was a limited public forum, UTD could restrict expression in or through The Mercury only if the restriction "(1) does 'not discriminate against speech on the basis of viewpoint' and (2) is 'reasonable in light of the purpose served by the forum.'" *Chiu*, 260 F.3d at 346 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107 (2001)).

96. Gutierrez engaged in protected expression when he published written work in The Mercury. He did so as an author, editor, and steward of the publication.

97. By approving the disclaimer's inclusion in the LTTE, Gutierrez engaged in protected expressive activity. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024) (reaffirming that intruding into the function of newspaper editors "interfered with the newspaper's 'exercise of

editorial control and judgment'" and "violate[d] the First Amendment" (quoting *Mia. Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974))); *see also* Student Media Bylaws, *supra*, § 4.3(a) ("Primary responsibility for ensuring accuracy in statements of fact [in The Mercury] rests with those who write *and edit* the materials." (emphasis added)).

98. The UT System Board Defendants, Moghe, and Smith exceeded the permissible limits on regulating a limited public forum by enforcing their policies against Gutierrez. The disclaimer—added through the editorial discretion afforded to an editor of The Mercury—became the subject of a UTD investigation based on a perceived viewpoint with which Defendants disagreed.

99. The inclusion of the disclaimer was protected expression under the First Amendment. UTD punished Gutierrez for that expression, thereby depriving him of constitutional rights.

100. Gutierrez was punished pursuant to the UT System Board Defendants' policies—promulgated through the Regents' Rules and implemented through UTD's Student Code of Conduct—and suffered the deprivation of his constitutional rights as a direct and proximate result of Defendants' enforcement of those policies against him.

101. Gutierrez specifically challenges the application of two policies: UTDBP3090 and § C, subsec. 9.6.15 of the Student Code of Conduct. The former "prohibits unlawful discrimination against a person because of their race, color, religion, sex (including pregnancy), sexual orientation, gender identity, gender expression, national origin, age, disability, genetic information, or veteran status," while the latter states: "Any student who engages in conduct that violates the Regents' Rules and Regulations, University rules and regulations, specific instructions issued by an

administrative official of the institution or the UT System acting in the course of their authorized duties, or federal, State, or local laws is subject to discipline. A student is subject to discipline for prohibited conduct that occurs on or off campus, including but not limited to University or UT System sponsored off-campus activities such as field trips, internships, rotations, study abroad, or clinical assignments, regardless of whether civil or criminal penalties are also imposed for such conduct." Defendants sanctioned Gutierrez for national-origin-based harassment, which violates UTDBP3090, which in turn violates § C, subsec. 9.6.15 of the Student Code of Conduct.

102. As a legal consequence of the UT System Board Defendants, Moghe, and Smith's violation of Gutierrez's First and Fourteenth Amendment rights, which are per se irreparable injuries, Gutierrez is entitled to judgment, declaratory relief, injunctive relief, and the reasonable costs of this action, including reasonable attorney's fees.

**COUNT THREE**
**Violation of the First and Fourteenth Amendments**
**First Amendment Retaliation (42 U.S.C. § 1983)**
**Against Moghe and Fitch**

103. Gutierrez realleges and incorporates the foregoing factual allegations as if set forth fully herein.

104. "[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. Riviera Beach*, 585 U.S. 87, 90 (2018); *see Rolf v. City of San Antonio*, 77 F.3d 823, 827 (5th Cir. 1996) ("[S]tate action designed to retaliate against and chill political expression strikes at the heart of the First Amendment.").

105. Before the LTTE, Gutierrez—an author and editor of The Mercury—wrote and published works unfavorable to UTD and covered topics in ways the university disliked. Those actions and writings constituted expression protected by the First Amendment.

106. After The Mercury published the LTTE, UTD removed Gutierrez from The Mercury and investigated allegations that he had discriminated.

107. Gutierrez's removal and the subsequent investigation into him were pretextual: UTD alleged national-origin discrimination even though Steinberg's complaint concerned religion.

108. Moghe and Fitch oversaw a sham investigation and disciplinary process. The proceeding and the panel's ultimate determination showed that Gutierrez had not engaged in discrimination; he had exercised his freedom of expression.

109. UTD did not care. Gutierrez had written, edited, and published pieces unflattering to the university. Moghe and Fitch used baseless allegations of discrimination to silence him.

110. Gutierrez's expression caused his removal from The Mercury, the investigation concerning the LTTE, the resulting sanctions, and the subsequent investigation. Moghe and Smith approved the sanctions and are responsible for enforcing them.

111. Through policies administered by Moghe and Fitch, UTD has punished Gutierrez for exercising a constitutional right. The Constitution forbids that retaliation.

112. As a legal consequence of Moghe and Fitch's violation of Gutierrez's First and Fourteenth Amendment rights, which are per se irreparable injuries, Gutierrez asserts this cause of action against Moghe and Fitch in their individual capacities and is entitled to compensatory damages, declaratory relief, injunctive relief, and the reasonable costs of this action, including reasonable attorney's fees.

## Jury Demand

113. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution, Gutierrez demands a jury trial on all issues so

triable.

**Prayer for Relief**

WHEREFORE, Gutierrez respectfully requests that this Court award:

A. Judgment in favor of Gutierrez decreeing that Defendants' application of their policies violated Gutierrez's right to free speech under the First and Fourteenth Amendments to the United States Constitution;

B. Judgment in favor of Gutierrez decreeing that Moghe and Fitch's acts towards Gutierrez constituted retaliation for expressive activities protected by the First and Fourteenth Amendments to the United States Constitution;

C. Judgment vacating Defendants' discrimination determination against Gutierrez, rescinding the deferred suspension, rescinding the education sanction, and expunging Gutierrez's disciplinary record;

D. Judgment prohibiting the application of the policies under which Defendants unlawfully sanctioned Gutierrez simply because he engaged in journalism—a protected constitutional activity;

E. A declaratory judgment stating that Defendants' application of their policies violated Gutierrez's right to free speech under the First and Fourteenth Amendments to the United States Constitution;

F. A declaratory judgment stating that Moghe and Fitch's acts towards Gutierrez constituted retaliation for expressive activities protected by the First and Fourteenth Amendments to the United States Constitution;

G. A preliminary and permanent injunction restraining the enforcement of Defendants' policies against Gutierrez in a manner violative of the First and Fourteenth Amendments to the United States Constitution;

H. Nominal damages for the violation of Gutierrez's First and Fourteenth Amendment rights from Defendants sued in their individual capacities;

I. An award of attorney's fees and costs under 42 U.S.C. § 1988 and other applicable law; and

J. All other further legal and equitable relief as the Court may deem just and proper.

Dated: September 16, 2026

SBAITI & COMPANY PLLC

**Griffin S. Rubin**
Texas Bar No. 24121809
**Jonathan Bridges**
Texas Bar No. 24028835
**Cash W. Carter**
Texas Bar No. 24150521
3102 Maple Avenue, Suite 400
Dallas, Texas 75201
T: (214) 432-2899
F: (214) 853-4367
E: gsr@sbaitilaw.com
E: jeb@sbaitilaw.com
E: cash.carter@sbaitilaw.com

*Counsel for Plaintiff Gregorio Olivares Gutierrez*

# VERIFICATION

I, Gregorio Olivares Gutierrez, hereby affirm as follows:

1. I am over eighteen years of age and am competent to make this Verification.

2. I am the plaintiff identified in the foregoing Verified Complaint.

3. I have read the factual allegations in the foregoing Verified Complaint.

4. The factual allegations in the foregoing are, to the best of my knowledge and belief, true and correct.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 16, 2026.

Gregorio Olivares G.

Gregorio Olivares Gutierrez