**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| GREGORIO OLIVARES GUTIERREZ,<br>Plaintiff,<br>v.<br>DR. PRABHAS V. MOGHE, et al.,<br>Defendants. | Case No. 1:26-cv-02546-XR<br>**BRIEF OF AMICI CURIAE LAW PROFESSORS FAISAL CHAUDHRY, MOHAMMAD FADEL, AND RAMSI A. WOODCOCK IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (ECF 12)** |

## INTEREST OF AMICI CURIAE

Amici are law professors who hold, and express in their teaching, scholarship, or public commentary, views supportive of Palestinian rights and critical of the State of Israel and of Zionism. Professors Chaudhry and Woodcock hold faculty appointments at American public universities. Professor Fadel teaches in Canada, but he was educated and has taught at American universities. He has lectured at the University of Texas at Austin on topics related to Israel and Palestine and has been invited to lecture there again in February 2027. Amici's titles and affiliations appear in the Appendix.

Amici's interest is in the rule that determines whether a public university may treat speech about Israel as discrimination against Jewish members of the university community. The University of Texas at Dallas ("UTD") found that a student editor harassed a Jewish student on the basis of national origin by publishing the student's letter about Israel with an editor's note that cited a United Nations commission's findings against Israel. If that theory is sound, every member of a university community who criticizes Israel's conduct in print risks the same charge. Faculty and students who speak and write about Israel and Palestine, as amici do, live under that rule. In the interest of full disclosure, Professor Woodcock is the plaintiff in *Woodcock v.*

*Capilouto*, No. 5:25-cv-00424 (E.D. Ky. filed Nov. 13, 2025), and in related actions in Franklin Circuit Court, Kentucky, which challenge his suspension by the University of Kentucky following his speech about Israel and Palestine.

No party or party's counsel authored this brief in whole or in part, and no person other than amici contributed money intended to fund its preparation or submission.

## INTRODUCTION

UTD charged Plaintiff Gregorio Olivares Gutierrez, the former editor-in-chief of the student newspaper *The Mercury*, with "national origin-based harassment." ECF 12-2 at 3. According to the complaint, UTD reasoned that the student who complained is Jewish and that the ancestral homeland of the Jewish people is the modern state of Israel. Compl. ¶ 57; *see* ECF 12 at 11. The conduct at issue was not an insult, a threat, or an epithet. It was the editing of a letter to the editor titled "Campus antisemitism" and the publication of that letter, unaltered, beneath an editor's note that cited a United Nations commission's findings against Israel and criticized the letter's presentation of opinion as fact. ECF 12-2 at 6–7. The University's discipline committee found that this conduct harassed the letter's author because of the author's "Jewish identity and ancestry." *Id.* at 9.

Amici write to explain why the theory on which UTD disciplined Plaintiff cannot be squared with the First Amendment or with UTD's own harassment policy. Part I explains that criticism of a foreign state's conduct is not, standing alone, harassment of anyone because of national origin or ancestry, and that UTD's committee pointed to nothing more. Part II explains that the committee's findings punish the content of the note, which is protected editorial judgment. Part III explains that a single editing exchange and a single published note on a public

controversy cannot be harassment under any standard consistent with the First Amendment, or under UTD's own policy.

## ARGUMENT

### I. Criticism of a Foreign State's Conduct Is Not, Standing Alone, Harassment Because of National Origin or Ancestry.

Universities teach students from every country. Those students hear their governments criticized. A French student is not harassed because of national origin when a classmate condemns French policy. A Russian student is not harassed because of national origin when a professor condemns Russia's invasion of Ukraine. The same is true of Israel, and of the students of every faith and ancestry who identify with it. Plaintiff explains that, if criticism of Israel were harassment because of Jewish ancestry, "any anti-Israel speech—even a discussion of current geopolitics—would constitute actionable harassment. That is not the law." ECF 12 at 24. The federal agency that enforces Title VI in education agrees: "Speech expressing views regarding a particular country's policies or practices is protected by the First Amendment and does not necessarily implicate federal civil rights laws." U.S. Dep't of Educ., Off. for C.R., *Dear Colleague Letter: Protecting Students from Discrimination, such as Harassment, Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics* 16 (May 7, 2024). And "[t]he offensiveness of a particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a hostile environment under Title VI." *Id.* at 5.

Amici take no position on whether or how far Title VI reaches discrimination based on shared ancestry. The Court need not decide that question. On any view of it, the speech at issue here is commentary about the conduct of a foreign government. Commentary of that kind is not, without more, harassment of anyone because of national origin or ancestry. A contrary rule

would make every debate about a foreign government a potential civil rights violation. Such a rule would also cut in every direction at once. The First Circuit recognized as much when it observed that Muslim and Palestinian students could bring the mirror-image claim that pro-Israel speech harassed them. *StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 158 F.4th 1, 17 (1st Cir. 2025). The court "decline[d] to interpret Title VI as arming either side of that debate with the powers of a censor." *Id.*

The First Circuit also rejected the premise of UTD's theory. The plaintiffs in that Title VI suit, brought on behalf of Jewish students at the Massachusetts Institute of Technology, defined Zionism as "the belief that Jews have the right to self-determination in their ancestral homeland of Israel" and asked the court to treat anti-Zionist speech as antisemitic harassment. *Id.* at 16. The court answered that the plaintiffs were "entitled to their own interpretive lens equating anti-Zionism (as they define it) and antisemitism," but that "it is another matter altogether to insist that others must be bound by plaintiffs' view." *Id.* It "decline[d] plaintiffs' invitation to hold that the protestors' speech constituted antisemitic harassment actionable under Title VI merely because it was stridently pro-Palestinian and anti-Zionist." *Id.* at 19. And it observed that most of the conduct at issue was "speech protected by the First Amendment," adding that "we do not construe Title VI as requiring a university to quash protected speech." *Id.* at 11–12.

UTD's findings about the note rest on the commentary itself. According to the complaint, UTD reasoned that because the student who complained, Jade Steinberg, is Jewish, and because the ancestral homeland of the Jewish people is the modern state of Israel, Plaintiff's treatment of Steinberg's letter about Israel "implicated Steinberg's ancestry." Compl. ¶ 57; *see* ECF 12 at 11. The committee then found that Plaintiff's editing "challenged Steinberg's opinions and personal perspective as a Jewish student describing experiences with antisemitism and reactions to related

geopolitical events." ECF 12-2 at 8. It found that the note "functioned instead to discredit Steinberg and essentially invited readers to disregard his viewpoint." *Id.* at 9. And it faulted the note because it "present[ed] a counter statement designed to argue with statements made in the [letter]." *Id.* The counter-statement was a sentence quoting a United Nations commission's findings about the conduct of the Israeli government. Challenging a writer's opinions and inviting readers to disregard a viewpoint are what editors do when they answer a letter. The committee did not find that Plaintiff said anything about Steinberg's ancestry.

## II. The Committee's Findings Punish the Content of an Editorial Judgment That the First Amendment Protects.

The First Amendment protects an editor's selection and presentation of other people's speech: "the presentation of an edited compilation of speech generated by other persons is a staple of most newspapers' opinion pages, which, of course, fall squarely within the core of First Amendment security." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995). The Court has since reaffirmed that "[d]eciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own," and its example was "a newspaper opinion page." *Moody v. NetChoice, LLC*, 603 U.S. 707, 144 S. Ct. 2383, 2402 (2024). That protection "shield[s] just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley*, 515 U.S. at 574. "A responsible press is an undoubtedly desirable goal, but press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974).

The Fifth Circuit has applied these principles to student publications at public universities. "[O]nce a University recognizes a student activity which has elements of free expression, it can act to censor that expression only if it acts consistent with First Amendment

constitutional guarantees." *Bazaar v. Fortune*, 476 F.2d 570, 574 (5th Cir.), *aff'd as modified*, 489 F.2d 225 (5th Cir. 1973) (en banc) (per curiam). The en banc court's only modification was to permit the university, at its option, to stamp the student magazine with the disclaimer "This is not an official publication of the University." 489 F.2d at 225. The university could disclaim sponsorship of the magazine. It could not punish the students who edited it. The Fifth Circuit later applied the same principle when a university president removed student editors because of the quality of their editorial work. Faults of that kind, the court held, though they "could embarrass, and perhaps bring some element of disrepute to the school," were "clearly not the sort which could lead to significant disruption on the university campus or within its educational processes." *Schiff v. Williams*, 519 F.2d 257, 261 (5th Cir. 1975). And the Supreme Court has held that a state university may not discipline a student because of "the disapproved content of the newspaper" the student distributed. *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973) (per curiam).

The committee did not purport to find disruption. It found that Plaintiff chose the wrong words. It listed the "editorial alternatives" that would have been acceptable: "declining to publish the [letter] at all, publishing it without editorial commentary, or publishing it with a neutral 'editor's note.'" ECF 12-2 at 8–9. It faulted Plaintiff for calling the note a "disclaimer," which it described as a word that "by definition is a disavowal or repudiation," and for including "a counter statement designed to argue with statements made in the [letter]." *Id.* at 9. On the committee's own account, then, Plaintiff would have been free to publish nothing, or to publish the letter in silence. What he could not do was publish the letter together with his paper's disagreement. A rule that permits an editor to suppress a letter but forbids the editor to answer it inverts the First Amendment. The editor's note was itself an answer to speech the editor

disagreed with. Readers who disagreed with the note answered it in turn. *The Mercury* published a later letter criticizing the note. *Id.*

Nor does it matter that the committee called the note harassment. The committee examined the note's words, weighed what they conveyed, and concluded that they conveyed the wrong message about the letter. *Id.* at 8–9. That is a judgment about content. When a public university disciplines a student because of "the disapproved content" of a student newspaper, the label it attaches to the discipline does not change the constitutional analysis. *See Papish*, 410 U.S. at 670; ECF 12 at 22.

## III. One Editing Exchange and One Published Note on a Public Controversy Cannot Be Harassment Under the First Amendment or Under UTD's Own Policy.

The First Amendment's protections apply with at least as much force at a university as in a high school, because "public secondary and elementary school administrators are granted more leeway [to restrict speech] than public colleges and universities." *DeJohn v. Temple Univ.*, 537 F.3d 301, 316 (3d Cir. 2008) (alteration in original) (internal quotation marks omitted). For that reason, the standard for an educational institution's liability for peer harassment is demanding. As Plaintiff notes, the harassment must be "so severe, pervasive, and objectively offensive" that it deprives the victim of the school's educational opportunities or benefits. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999); *see* ECF 12 at 23. The Supreme Court thought it "unlikely that Congress would have thought" even "a single instance of sufficiently severe one-on-one peer harassment" sufficient. *Id.* at 652–53. And the Third Circuit has explained that, without "any requirement akin to a showing of severity or pervasiveness," a university harassment policy "provides no shelter for core protected speech." *DeJohn*, 537 F.3d at 317–18.

UTD's committee made no finding of either kind. It asked whether Plaintiff's conduct was "sufficiently severe, pervasive, or persistent." ECF 12-2 at 8. It never found the conduct

severe. It described the conduct, in the alternative, as "pervasive or persistent." *Id.* But it rested its finding on the third and weakest of its alternatives, which appears nowhere in *Davis*: Plaintiff's actions "were sufficiently persistent and targeted to satisfy the University's harassment standard." *Id.* It later found that Plaintiff's "contentious approach to Steinberg, the [letter] during the review process, and the widely disseminated disclaimer constituted persistent conduct directed at Steinberg." *Id.* at 10. The conduct consisted of editorial comments on drafts of a single letter, followed by one editor's note on the published letter. *Id.* at 4–8. The editing ended when the letter was published. The note appeared once. Whatever its tone, it addressed a subject of intense public debate. A finding that such conduct was "persistent" harassment would allow a university to discipline any editor whose handling of a single controversial submission displeases its author.

UTD's own policy reflects the same limit. The policy defines the "verbal conduct" that can constitute harassment as expression that both is "personally directed at a specific individual or group of identifiable individuals" and "is not necessary to an argument for or against the substance of any political, religious, philosophical, ideological, or academic idea." ECF 12-5 at 3. It adds: "Constitutionally protected expression cannot be considered harassment under this policy." *Id.* The committee quoted the policy's general definition of harassment, ECF 12-2 at 3, but its findings do not address either limit. An editor's note disputing the factual claims of a published letter about Israel, and citing a United Nations report in support, is an argument about the substance of a political idea. The Fifth Circuit has noted the importance of exactly this kind of exclusion in a University of Texas speech rule. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 334 (5th Cir. 2020) (noting that UT Austin's rules "explicitly exclude from 'verbal harassment'

the 'mak[ing] [of] an argument for or against the substance of any political, religious, philosophical, ideological, or academic idea'").

The consequences of UTD's approach extend beyond this case. If an editor may be found to have committed national-origin harassment by disputing a published letter about Israel, student editors will decline to publish letters about Israel and Palestine, or will publish them only without comment. Faculty and students who write about the conflict will face the same risk whenever someone who disagrees with them identifies with one side of it. "For the University, by regulation, to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 836 (1995).

**CONCLUSION**

The Court should grant Plaintiff's motion for a temporary restraining order and preliminary injunction.

Dated: November 11, 2026

Respectfully Submitted,

/s/ Rebecca Webber
Rebecca Webber
Webber Law
Texas State Bar Number 24060805
4228 Threadgill Street
Austin, Texas 78723
512-537-8833
rebecca@rebweblaw.com

Counsel for Amici Curiae Law Professors

**CERTIFICATE OF SERVICE**

I certify that on November 11, 2026, I filed this brief through the Court's CM/ECF system, which will send notice of the filing to all counsel of record.

/s/ Rebecca Webber

Rebecca Webber

## APPENDIX: LIST OF AMICI CURIAE

Faisal Chaudhry, Associate Professor of Law, University of Massachusetts School of Law

Mohammad Fadel, Professor of Law, University of Toronto Faculty of Law

Ramsi A. Woodcock, Edward H. Metcalf Jr. Professor of Law, University of Kentucky J. David Rosenberg College of Law

Institutional affiliations are given for identification only.