# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| GREGORIO OLIVARES GUTIERREZ,<br><br>*Plaintiff*,<br><br>v.<br><br>DR. PRABHAS V. MOGHE, in his individual capacity and his official capacity as President of the University of Texas at Dallas, DR. GENE FITCH, in his individual capacity, DR. AMANDA SMITH, in her official capacity as Interim Vice President for Student Affairs and Dean of Students of the University of Texas at Dallas, DR. GREGG DIECKMANN, in his individual capacity and his official capacity as Delegee of the Vice President for Student Affairs of the University of Texas at Dallas, SHAQ MASSEY, in his official capacity as Director of the Office of Community Standards and Conduct of the University of Texas at Dallas, DAESHAWN LYLES, in his official capacity as Assistant Director of the Office of Community Standards and Conduct of the University of Texas at Dallas, and FELICIA CHISM, in her official capacity as the Director of Prevention Education, Clery Compliance Officer, and Deputy Title IX Coordinator of the University of Texas at Dallas,<br><br>JOHN M. ZERWAS, M.D., in his official capacity as Chancellor of the University of Texas System, and<br><br>KEVIN P. ELTIFE, JANIECE LONGORIA, JAMES C. "RAD" WEAVER, CHRISTINA MELTON CRAIN, ROBERT P. GAUNTT, JODIE LEE JILES, NOLAN PEREZ, M.D., STUART W. STEDMAN, and KELCY L. WARREN, in their official capacities as members of the Board of Regents of the University of Texas System,<br><br>*Defendants*. | Case No. 1:26-CV-02546-XR<br><br>**VERIFIED FIRST AMENDED COMPLAINT**<br><br>**<u>Jury Trial Demanded</u>** |

## Introduction

1. An undergraduate student at the University of Texas at Dallas, a component institution of the University of Texas System, was punished for practicing journalism. That punishment violates the First and Fourteenth Amendments to the United States Constitution and must be enjoined.

2. Plaintiff Gregorio Olivares Gutierrez, a member of the university's student newspaper and ultimately its editor-in-chief, reported on protests, free speech, policing, the university's connections to the Epstein files, and other matters the administration did not want covered. That coverage made Gutierrez a target.

3. Later, when Gutierrez reviewed a letter to the editor and required its author to substantiate factual claims, as standard journalistic practice demands, state officials used their authority not to protect free expression, but to silence it.

4. Defendants used the author's complaint as a pretext to "investigate" and sanction Gutierrez.

5. Gutierrez brings this action to vindicate his constitutional rights. He seeks to stop Defendants' efforts to retaliate against him for exercising those rights. And he asks the Court to intervene to protect his rights to report, edit, and speak without fear of punishment by the government.

## Parties

*Plaintiff*

6. Gregorio Olivares Gutierrez is a student at the University of Texas at Dallas ("UTD"). He is a resident of Dallas, Texas and was a resident there at all relevant times.

*Defendants*

7. The Board of Regents of the University of Texas System is a governmental entity under the laws of the State of Texas and is the governing body for the University of Texas System (the "UT System") and its component institutions, including UTD. *See* TEX. EDUC. CODE § 65.02. The Board of Regents is based in Austin, Texas, and regularly convenes there to conduct UT System business.

8. Kevin P. Eltife, sued in his official capacity, is a member of and serves as Chairman of the Board of Regents of the University of Texas System.

9. Janiece Longoria, sued in her official capacity, is a member of and serves as Vice Chairman of the Board of Regents of the University of Texas System.

10. James C. "Rad" Weaver, sued in his official capacity, is a member of and serves as Vice Chairman of the Board of Regents of the University of Texas System.

11. Christina Melton Crain, Robert P. Gauntt, Jodie Lee Jiles, Nolan Perez, M.D., Stuart W. Stedman, and Kelcy L. Warren are members of the Board of Regents of the University of Texas System.[1] They are sued in their official capacities. Eltife, Longoria, Weaver, Crain, Gauntt, Jiles, Perez, Stedman, and Warren are collectively referred to as the "Regents."

---

[1] Jeremiah Shelby Clarke is a student regent for the UT System, but lacks voting power and "is not a member of the board of regents of the system for which the student is appointed." *See* TEX. EDUC. CODE § 51.355(e). Thus, he is not named as a defendant.

12. Texas law authorizes the Regents "to govern, operate, support, and maintain each of the component institutions that are now or may hereafter be included in a part of The University of Texas System," which includes UTD. TEX. EDUC. CODE § 65.31(a); *see id.* § 65.11.

13. Texas law also authorizes the Regents "to promulgate and enforce such other rules and regulations for the operation, control, and management of the university system and the component institutions thereof as [they] may deem either necessary or desirable." *Id.* § 65.31(c); *see id.* § 70.04 (governing UTD); *Offices*, UNIV. OF TEX. AT DALL., https://utdallas.edu/about-us/offices/ (last visited Nov. 23, 2026) ("[U]T Dallas' governance begins with the Board of Regents.").

14. John M. Zerwas, M.D., is Chancellor of the University of Texas System. Chancellor Zerwas is the chief executive officer of the UT System and reports to the Regents. He is directly responsible for all aspects of the UT System's operations. *See* TEX. EDUC. CODE § 65.16(c); UNIV. OF TEX. SYS. BD. OF REGENTS R. 20101.

15. The Regents formally exercise their power and authority through Chancellor Zerwas. He is formally responsible for implementing the Regents' policies, purposes, and goals, and he directs the management and administration of all UT System institutions, including UTD.

16. Zerwas, Eltife, Longoria, Weaver, Crain, Gauntt, Jiles, Perez, Stedman, and Warren are collectively referred to as the "UT System Board Defendants."

17. Dr. Prabhas V. Moghe, sued in his individual and official capacities, is the president of UTD. Moghe is the chief executive officer of UTD with "general authority and responsibility for the administration of that institution." UNIV. OF TEX. SYS. BD. OF REGENTS R. 20201, § 4. That authority includes developing and administering policies "for the program, organization,

and operation of the institution," "policies relating to students," and "rules and regulations for the governance of the institution." *Id.* §§ 4.1, .3, .9. As UTD's chief executive, he possesses "broad authority for campus administration." *Offices*, UNIV. OF TEX. AT DALL., https://utdallas.edu/about-us/offices/.

18. Dr. Gene Fitch, sued in his individual capacity, was the Vice President of Student Affairs of UTD. As Vice President of Student Affairs, Dr. Fitch was the ultimate decisionmaker concerning student discipline and the application of the Student Code of Conduct. *See* UTDSP5003, Student Code of Conduct, § G, subsec. 20 (June 1, 2020). UTD's Student Code of Conduct was developed "in accordance with The University of Texas System (UT System) model policy" "[p]ursuant to the Regent Rules." *Id.* at § A, subsec. 1.1; *see* UNIV. OF TEX. SYS. BD. OF REGENTS R. 50101, §§ 2.2, .5.

19. Dr. Amanda Smith, sued in her official capacity, is the Interim Vice President of Student Affairs and the Dean of Students of UTD. As Dean of Students, Dr. Smith is "responsible for the administration of the disciplinary process" under UTD's Student Code of Conduct. *See* UTDSP5003, Student Code of Conduct, § A, subsec. 3.1.2. As Interim Vice President of Student Affairs,[2] Dr. Smith is the ultimate decisionmaker concerning student discipline and the application of the Student Code of Conduct. *See id.* at § G, subsec. 20.

20. Dr. Gregg Dieckmann, sued in his individual and official capacities, is an Associate Professor at UTD. He was personally involved in the disciplinary process at issue.

---

[2] Upon Dr. Fitch's retirement, Dr. Smith became the Interim Vice President for Student Affairs. *See* FED. R. CIV. P. 25(d).

21. Shaq Massey, sued in his official capacity, is the Director of UTD's Office of Community Standards and Conduct (the "OCSC"). He oversees the OCSC and was personally involved in the disciplinary process at issue.

22. Daeshawn Lyles, sued in his official capacity, is the Assistant Director of the OCSC. He was personally involved in the disciplinary process at issue.

23. Felicia Chism, sued in her official capacity, is the Director of Prevention Education, Clery Compliance Officer, and Deputy Title IX Coordinator at UTD. She was personally involved in the disciplinary process at issue.

24. Moghe, Smith, Massey, Lyles, and Chism are collectively referred to as the "UTD Defendants."

25. The UT System Board Defendants exercise or exercised direct supervisory authority over the UTD Defendants. The Regents select the president of each component institution, and each president serves "at the pleasure of the Chancellor, subject to the approval of the Board of Regents." UNIV. OF TEX. SYS. BD. OF REGENTS R. 20101, §§ 1, 3. Moghe hires and fires the vice presidents and deans of UTD, *see* UNIV. OF TEX. SYS. BD. OF REGENTS R. 20102, § 2.1.1, but the Regents may reverse any such decision, *see* TEX. EDUC. CODE §§ 51.352(g), 65.32. Through that structure, the Regents can direct Chancellor Zerwas to intervene in, review, or countermand decisions made by UTD, including decisions implementing or enforcing the policies challenged here.

26. At all relevant times, each Defendant acted under color of state law.

## Jurisdiction and Venue

27. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action raises federal questions under the First and Fourteenth Amendments to the United States Constitution through 42 U.S.C. § 1983.

28. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1343(a)(3) because this action seeks to redress the deprivation of Gutierrez's constitutional rights.

29. Venue in this Court is proper under 28 U.S.C. § 1391(b)(1) because at least one Defendant resides in this district and all Defendants are residents of Texas.

## Factual Allegations

*The UT System Board Defendants and Moghe Set the Stage for This Action*

30. Zerwas and the Regents laid the foundation for and caused the enforcement of institutional policy against Gutierrez in violation of his constitutional rights. They instructed component institutions, including UTD, how to treat those whose expression the UT System disfavored.

31. The UT System Board Defendants have made no secret of their views on campus expression. As they see it, free speech is to be tolerated only so long as it does not interfere with "the functioning of the UT System," does not involve "refusal to comply with institutional policies," and is exercised in an "effective and responsible" manner—as the Regents define those terms. Those views did not stay in the boardroom. They took the form not just of resolutions,

Regents' policies, and public pronouncements, but of direct involvement in campus-level decisions—including the disciplinary proceeding against Gutierrez.

32. The UT System Board Defendants do not govern from a distance. They have repeatedly and publicly asserted control over how UT System institutions—including UTD—respond to campus expression. And they have made clear that campus presidents act with, and at the direction of, Zerwas and the Regents. The UT System Board Defendants do not merely possess this authority; they exercise it in specific cases at component institutions like UTD.

33. In spring 2024, students at UT System institutions, including UTD, organized pro-Palestine protests. Those institutions, UTD among them, called in law enforcement to respond. Hundreds of students and faculty were arrested.

34. Defending those decisions at a Regents meeting, Chairman Eltife dispelled any notion that campus presidents acted alone. Eltife explained that no president of a UT System component institution decided independently to call in law enforcement; rather, he said, Zerwas "and I and [the Regents] are always involved in those decisions. They were the right decision, and we will do it again if needed."

35. Eltife's message was clear. Campus presidents do not decide alone how to police and punish—particularly on matters of public concern. Zerwas and the Regents make those specific

decisions with them. Eltife was not describing authority held in reserve; he was describing how the UT System Board Defendants actually exercise that authority.

36. Eltife went further: "There is also some talk out there about votes of no confidence on our presidents. I would say that the vote of no confidence or of confidence that matters the most is the vote of this Board."

37. That statement was a message to every UT System president, including Moghe: a president's standing depends not on the confidence of students or faculty but on the confidence of the Regents. And the Regents had just announced what earns that confidence—an aggressive institutional response to viewpoints challenging state orthodoxy.

38. On information and belief, Zerwas and the Regents communicated the same views and expectations to UTD's leadership, including Moghe.

39. In 2025, after the pro-Palestine protests, the Texas Legislature enacted Senate Bill 2972 to restrict the kind of campus expression those protests embodied. *See* Tex. S.B. 2972, 89th Leg., R.S. (2025).

40. The Regents responded by unanimously adopting policies that every UT System institution, including UTD, must follow.

41. Those policies make the UT System's commitment to free expression conditional. Under them, the UT System respects and upholds the right to free speech "[e]xcept insofar as limitations on that freedom are necessary to the functioning of the UT System." The policies further provide that "UT institutions may restrict speech and expression

that . . . constitutes . . . harassment . . . or that is otherwise directly incompatible with the functioning of any UT institution."

42. The Regents' policies also declare that "fostering the ability of individual members of the UT System community to engage in . . . debate and deliberation in an *effective and responsible* manner" is an "essential part of the educational mission of the UT System and the UT institutions." Under the Regents' framework, then, speech is protected when the institution deems it "effective and responsible"—and is subject to restriction as "harassment" when the institution does not.

43. On information and belief, the Regents' actions, taken directly and through Zerwas, were part of a broader effort by the UT System Board Defendants to suppress viewpoints and subjects that depart from the UT System's ideological orthodoxy. On information and belief, Zerwas—through whom the Regents exercise their power and who implements their policies, purposes, and goals—communicated that direction to UT System presidents, including Moghe, and expected them to carry it out in individual disciplinary matters.

44. Moghe understood the messages from Zerwas and the Regents. He serves at Zerwas's pleasure, subject to the Regents' approval. And Moghe's own statements confirm that he views his role as earning the trust of the Regents and the state officials to whom they answer.

45. Moghe has described himself as the point of escalation—the "first place"—for the most serious student concerns at UTD.

46. On information and belief, Moghe was involved in the disciplinary process and sanctions against Gutierrez because the complaint against Gutierrez alleged discrimination by the editor-in-chief of UTD's official student newspaper, concerned content about Israel and Palestine,

and arose in the immediate aftermath of the 2024 protests and the Regents' public statements. On information and belief, Moghe knew of, oversaw, and approved the decisions to pursue and impose sanctions against Gutierrez.

47. Moghe has also made clear to whom he believes UTD must answer: not the Constitution, but the politicians who oversee the state's investment in UTD. In Moghe's view, their trust and approval must be secured.

48. Gutierrez's reporting did not help Moghe earn that trust or approval. His coverage of the encampment, the law-enforcement raid, the arrests, campus policing, and the administration's response cast UTD—and, by extension, the Regents—in an unfavorable light.

49. Even Moghe's professed support for student expression reveals the problem. He has said that UTD "ha[s] to find ways" for students to express themselves. In Moghe's view, free expression is not a constitutional right but a privilege the administration allows—and only so far as it does not jeopardize his standing with the Regents and politicians in Austin.

50. Throughout the disciplinary process, Fitch answered to Moghe and to Moghe's predecessor, Richard Benson. As Vice President for Student Affairs, Fitch was charged with implementing the Student Code of Conduct. On information and belief, Fitch administered and implemented the Student Code of Conduct against Gutierrez—including the sanctions that remain in effect and the investigation now pending—at Moghe's direction or with his approval, and in accordance with the UT System Board Defendants' policies, views, and directives.

51. The UT System Board Defendants' involvement in campus discipline did not end with the 2024 protests. On information and belief, the UT System Board Defendants continued their pattern and practice of directly involving themselves in individual instances of campus

discipline regarding matters of public concern—and they did so in Gutierrez's case. Jessica Witte, Associate General Counsel to the UT System—not UTD—attended Gutierrez's hearing. The UT System's Office of General Counsel is led by the General Counsel, who is also a Vice Chancellor of the UT System and reports directly to Zerwas and the Regents.

52. On information and belief, the UT System Board Defendants—through both their own direct actions and their influence over the UTD Defendants—caused the enforcement of the Student Code of Conduct against Gutierrez. The constitutional violation at the heart of this case thus runs from the Regents, through Zerwas, and the UTD Defendants, to Gutierrez.

*Gutierrez and The Mercury*

53. In fall 2023, Gutierrez joined The Mercury, UTD's student newspaper, as a staff writer. By that December, he had become a student editor; by summer 2024, he had risen to editor-in-chief, assuming responsibility for the publication's editorial judgment and standards.

54. As a staff member, Gutierrez covered current events and newsworthy matters. Not every subject welcomed the scrutiny, and UTD was no exception.

55. Gutierrez's reporting repeatedly cast UTD in an unfavorable light. He covered matters of public concern—campus speech, student protests, university administration, campus policing, student government, discrimination, sexual assault, and infrastructure failures.

56. In December 2023, for instance, Gutierrez published an article criticizing UTD's removal of the "Spirit Rocks"—a campus space long used for political and community expression—as damaging to campus culture and potentially unconstitutional.

57. In April and May 2024, Gutierrez and other journalists for The Mercury reported on pro-Palestine campus protests, the May 1 encampment, the law-enforcement raid, student and

faculty arrests, the detention of protesters, and UTD's response. By July 2024, Gutierrez had published an Editor's Desk article addressing critical journalism and editorial standards in coverage of Israel, Palestine, and university policy.

58. Gutierrez's work earned acclaim from the College Media Association, the Associated Collegiate Press, the Texas Intercollegiate Press Association, the Society of Professional Journalists, and the Student Press Law Center.

59. By summer 2024, Gutierrez's reporting had made him a persistent thorn in UTD's side—especially for Student Affairs officials whose decisions affected students and student media. The administration found his journalism inconvenient.

*The Steinberg Letter to the Editor*

60. On July 31, 2024, UTD student Jonathan "Jade" Steinberg submitted a Letter to the Editor (the "Letter") to The Mercury for publication.

61. Under the Mercury Policy Compendium—the policies and procedures governing The Mercury as approved by its editorial board—the staff could make minor grammar and syntax corrections and offer edits and commentary as suggestions to the author. The compendium also recognized that, as a public forum, The Mercury could not engage in viewpoint discrimination when publishing Letters to the Editor—but it preserved the publication's discretion to decline publication. And the compendium required authors to provide sourcing for factual assertions.

62. After receiving the Letter, The Mercury staff began its review and editing process.

63. Steinberg, the president of the UTD Hillel chapter, was a visible figure on UTD's campus. They[3] are an outspoken advocate against antisemitism and in favor of Israel. The Letter,

[3] Steinberg's preferred pronouns are they/them.

titled "Campus antisemitism," mentioned antisemitism at UTD but focused primarily on Zionism and the Israel–Palestine conflict.

64. On August 4, 2024, Steinberg followed up with The Mercury about their piece. Gutierrez, as editor-in-chief, responded that The Mercury had selected the Letter for publication and would edit it the next day.

65. On August 5, 2024, Gutierrez returned the Letter to Steinberg with suggested edits and feedback. After reviewing and editing the Letter himself, Gutierrez provided approximately two dozen comments, including challenges to source credibility and requests for additional sourcing to support factual assertions. As Gutierrez explained—consistent with the compendium—even a Letter to the Editor required standard editorial sourcing and fact-checking for factual claims, not just firsthand personal experience.

66. The feedback served critical purposes. For one thing, The Mercury was subject to the same laws and bound by the same journalistic standards as any reputable publication. Publishing a piece without proper sourcing would not only violate those standards—it could expose The Mercury to legal liability. Moreover, journalistic practice required assertions of fact to withstand source vetting; otherwise, The Mercury might publish unverified, unsubstantiated writing, thereby transforming a journalistic publication into the comments section of a Facebook post.

67. On August 7, 2024, Steinberg submitted a revised version of the Letter and thanked Gutierrez for his edits. The next day, The Mercury's managing editor provided a second round of feedback—mostly nonsubstantive suggestions, but also requests for additional sourcing and support for suggestions Gutierrez had made and Steinberg had not addressed.

68. Days later, Steinberg rejected many of the proposed edits and suggestions, including direct requests for sources supporting the Letter's factual assertions.

69. Steinberg's refusal put The Mercury in a bind. The Letter addressed a salient public issue—one Gutierrez believed was vital to campus discourse after recent campus events. But Steinberg's decision not to substantiate the Letter's factual claims pushed the submission to the outermost boundary of what The Mercury could publish.

70. Ultimately, Gutierrez concluded that more voices were better than fewer. The Mercury published the Letter in full on August 19, 2024, without altering Steinberg's final submission.

71. To uphold journalistic standards and give readers appropriate context, The Mercury added a disclaimer at the top of the Letter. It read: "The information presented within this letter to the editor is the opinion of the author and should not be treated as news. On June 12, a UN commission found Israel guilty of 'crimes against humanity of extermination, gender persecution targeting Palestinian men and boys, murder, forcible transfer, and torture and inhuman and cruel treatment.' The presentation of opinion as fact within this article, despite repeated requests to address the issue, does not meet the journalistic standards of The Mercury." The disclaimer included a link to the referenced U.N. report.

72. The disclaimer is factually correct: the Letter is not news. A U.N. commission made the finding as represented. The Letter presents opinions as fact. And The Mercury repeatedly asked Steinberg to address that issue, but Steinberg elected not to—just as they had elected to submit the Letter for publication in the first place.

73. The next day, Steinberg filed an incident report with UTD's Office of Institutional Compliance, alleging that Gutierrez had discriminated against Steinberg by providing editorial feedback and adding the disclaimer.

*UTD Retaliates Against Gutierrez Through Pretextual Investigation*

74. UTD seized on Steinberg's complaint, using it as a pretext to punish Gutierrez for his prior reporting on the administration. It immediately escalated the complaint into the student-conduct disciplinary process.

75. On September 13, 2024—before even notifying Gutierrez of the investigation—UTD removed him from The Mercury. His removal triggered a staff strike, which led UTD to remove the striking students as well.

76. UTD did not inform Gutierrez of the investigation until October 15, 2024—nearly two full months after Steinberg filed the complaint and a full month after UTD had removed him from The Mercury.

77. Between his removal from The Mercury and UTD's notice of the investigation, Gutierrez and the other removed student journalists founded The Retrograde, a nonprofit newspaper registered in Texas. On October 14, 2024, The Retrograde published Gutierrez's news article, "North Texas neo-Nazis spread hate at UTD." The article covered far-right groups in North Texas and their advocacy at UTD, most recently through stickers. It included commentary from university officials on relevant policy and featured student leaders who argued that the university was not doing enough.

78. Gutierrez met with Chism, among others, on October 16, submitted a written response on October 21, and sat for an interview on October 29.

79. After thirteen months of near radio silence from the university, Lyles wrote to Gutierrez on November 12, 2025. Lyles stated that, in "[his] belief," Gutierrez had violated applicable university rules and would receive a two-year deferred suspension and an education sanction grounded in media ethics. Embracing a guilty-until-proven-innocent approach, the letter provided Gutierrez three paths forward: (1) decline to dispute the facts, accept responsibility, and accept the sanctions; (2) decline to dispute the facts, accept responsibility, but appeal the sanctions; or (3) dispute the facts and "NOT accept responsibility for the violation."

80. After reviewing UTD's letter and identifying its constitutional deficiencies, the Foundation for Individual Rights and Expression ("FIRE") wrote to UTD, detailing the illegality of the university's actions and demanding that it rescind the suspension. *See* Letter from FIRE to Prabhas V. Moghe (Nov. 19, 2025), https://www.fire.org/research-learn/fire-letter-university-texas-dallas-november-19-2025.

81. Facing public scrutiny, UTD reversed course. Rather than impose the suspension outright, it scheduled a disciplinary hearing before "neutral" adjudicators to hear evidence and testimony.

82. The resulting proceeding, held in February 2026, was not an adjudication; its outcome was predetermined. The "neutral" adjudicators were attorneys from a law firm paid by the hour to represent public universities, including UTD. Their service on the disciplinary panel violated the Student Code of Conduct, which requires such panels to consist of UTD faculty, staff, and students.

83. Before the hearing, Massey met with Gutierrez and outlined a process under which Gutierrez did not bear the burden of proof. But that process deviated from standard procedure. In

explaining how the panel would reach its decision, Massey remarked at least once that an aspect of the process was "not necessarily a university policy" and would not be found "in the student code." It would not be the last time UTD departed from its own policies in this process.

84. At the hearing, Lyles represented UTD, acting in effect as prosecutor.

85. UTD permitted Gutierrez an advisor, but the advisor could not speak or participate in the proceedings.

86. Until just before the hearing, Gutierrez knew only that he had been accused of discrimination against Steinberg in connection with the Letter; UTD kept the substance of the investigation hidden. Only then did Gutierrez learn that Defendants were not accusing him of religious discrimination—as Steinberg's complaint and the entire pre-hearing process had suggested. Instead, they alleged *national-origin* discrimination. Gutierrez was surprised: Steinberg is an American.

87. Defendants advanced the following theory: Steinberg is an adherent of the Jewish faith. Because the ancestral homeland of the Jewish people is the modern state of Israel, Defendants asserted, Gutierrez's actions implicated Steinberg's ancestry—allowing Defendants to bring national-origin discrimination charges via Title VI, which covers national origin but not religion. *See* 42 U.S.C. § 2000d.

88. The hearing made the pretext plain.

89. Zerwas and the Regents attended the hearing through counsel. On information and belief, they attended the hearing to monitor, and to ensure, the enforcement of the policies they instituted concerning speech and expression on campus in the wake of pro-Palestinian protests.

90. When questioned at the hearing, Steinberg made clear that they felt discriminated against because of their religion—not because of their geopolitical position on Israel. And Steinberg offered no evidence of discrimination beyond their own subjective belief.

91. When asked to identify proof of discrimination, Chism, the university's investigator, said she had compared the number of hyperlinks in other pieces published by The Mercury with those in the Letter. She also stated that the published drafts contained a similar number of hyperlinks and that the edits left for Steinberg were "unwelcome." From that, she concluded that Gutierrez had discriminated by giving Steinberg too much feedback—a conclusion with no logical or evidentiary support.

92. When asked why she had concluded that Gutierrez discriminated, Chism said that any reasonable person would have perceived his actions as discriminatory. Asked what she meant by "reasonable person," she identified only Steinberg—*the complainant.*

93. Gutierrez reiterated what he had maintained throughout the investigation: The Mercury weighed the Letter's questionable sourcing against the importance of its subject matter to campus discourse and decided to publish it with appropriate context, enabling readers to assess the issues for themselves.

*UTD Punishes Gutierrez for Exercising His Constitutional Rights*

94. UTD did not let the opportunity pass. A month after the hearing, the disciplinary panel found that Gutierrez had discriminated against Steinberg through an editing process that

"exceeded ordinary editorial suggestions." The panel relied on two grounds: (1) Steinberg's subjective perception of discrimination and (2) a comparison with two other opinion articles.

95. The panel then concluded—incredibly—that Gutierrez could have avoided discrimination by declining to publish the Letter, publishing it without commentary, or using what the panel called a "neutral" editor's note.

96. The effect was plain: the panel recharacterized Gutierrez's editorial judgment as actionable harassment and held him responsible under both the university's Nondiscrimination Policy and the Student Code of Conduct.

97. The panel imposed a two-year deferred suspension and an education sanction grounded in media ethics. The sanction required Gutierrez to complete a Nondiscrimination Policy module and a Media Ethics & Governance course and to submit a seven-to-ten-page reflective paper, all by November 20, 2026.[4] Meanwhile, the deferred suspension hung a sword of Damocles over Gutierrez's head—a threat designed to chill him into silence for the rest of his time at UTD.

98. Gutierrez appealed. Under the Student Code of Conduct, the appeal proceeded to Fitch for final consideration. Without explanation and at the eleventh hour, Fitch designated a faculty member—Dieckmann—to stand in his shoes to decide the appeal.

99. Dieckmann, acting as Fitch's delegee, affirmed the panel's decision. That decision remains in effect.

100. While the proverbial sword may be hanging, UTD plainly seeks to drop it on Gutierrez's head.

[4] By agreement of the parties on the record before the Court, this deadline has been extended to December 31, 2026, to allow the parties to pursue an interim resolution while this action proceeds.

101. In recent months, Gutierrez published an article about the off-campus doxxing of protesters from the pro-Palestinian protests at UTD, quoting public statements by Steinberg. Steinberg responded with another discrimination complaint—this time based on the article in which Gutierrez quoted a statement Steinberg had made publicly on Instagram.

102. UTD again elevated Steinberg's complaint to the student-conduct disciplinary process. Gutierrez now faces another investigation for exercising his First Amendment rights. If found guilty of "doing journalism" again, his deferred suspension would automatically take effect.

**Gutierrez's Injury**

103. Gutierrez realleges and incorporates the foregoing factual allegations as if set forth fully herein.

104. Defendants' conduct has caused Gutierrez injury by chilling his speech and other activity protected by the First Amendment.

105. Gutierrez reasonably fears, and continues to fear, discipline for exercising his First Amendment rights as a journalist and member of the UTD student body.

106. The sanctions remain in effect against Gutierrez under a system enforced by the UTD Defendants, with the OCSC ultimately reporting to Smith as the designated final authority on administration of the Student Code of Conduct. Smith's actions are subject to Moghe's direct and indirect control. On information and belief, Moghe and the UT System Board Defendants have worked with Smith to oversee, guide, and direct enforcement of the Student Code of Conduct against Gutierrez.

107. No authority permits Defendants to deprive Gutierrez of his constitutional rights or education because he engaged in First Amendment activity that the university subjectively

deemed unfavorable or objectionable. *See Shelton v. Tucker*, 364 U.S. 479, 487 (1960) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.").

108. Through discipline—including educational courses and forced reflective writing—Defendants are attempting to impose a state-preferred perspective on a matter of public concern because Gutierrez exercised his First Amendment rights. That effort violates Gutierrez's constitutional rights. *See Chiles v. Salazar*, 607 U.S. 627, 655 (2026) ("[T]he First Amendment stands as a shield against any effort to enforce orthodoxy in thought or speech in this country. It reflects instead a judgment that every American possesses an inalienable right to think and speak freely, and a faith in the free marketplace of ideas as the best means for discovering truth.").

109. By imposing a deferred suspension, Defendants are using an age-old method of state-sponsored speech inhibition—an ever-looming threat of investigation and further discipline if Gutierrez again "steps out of line" by engaging in free speech. The suspension is designed to chill his speech, to make him think twice before engaging in journalism Defendants disfavor. It is the quintessential sword of Damocles: suspension or expulsion hangs over Gutierrez's head, ready to fall should he express anything Defendants do not like. *See First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 192 (2026) ("The value of a sword of Damocles is that it hangs—not that it drops." (brackets and citation omitted)).

110. Defendants continue to injure Gutierrez by chilling his speech and other First Amendment activity. As described above, Gutierrez is again being investigated for engaging in expressive activity.

111. The injury further threatens Gutierrez's future. Defendants know, through counsel, that Gutierrez is applying to law school. The sanctions are part of his disciplinary record, and Defendants maintain that they cannot remove them, even temporarily, because the records are state records. Those records may harm Gutierrez's future opportunities even though the sanctions are unconstitutional.

112. Defendants' actions are a direct and proximate cause of Gutierrez's reasonable fear of discipline for engaging in constitutionally protected activities.

113. Fifth Circuit precedent makes clear that official-capacity defendants need only have "some connection" with enforcement of the challenged act, and that an injury need only be "fairly traceable" to that defendant. *See Jackson v. Wright*, 82 F.4th 362, 367–68 (5th Cir. 2023). The UT System Board Defendants' governing authority over the Regents' Rules, the Student Code of Conduct, and the officials who enforced those policies against Gutierrez makes his injuries traceable to them. Their authority to direct or countermand the relevant decisions and to amend the governing rules further connects the ongoing sanctions and threatened discipline to the UT System Board Defendants. And the UT System Board Defendants have done more than hold that authority—they have directly involved themselves in individual instances of campus discipline on matters of public concern that challenge state orthodoxy. Through the actions and words described above—including Eltife's declaration that Zerwas and the Regents are "always involved" in such decisions and will act again "if needed"—they have demonstrated their willingness to exercise it. On information and belief, their views, policies, and directives were a but-for cause of the UTD Defendants' oversight and implementation of the Student Code of Conduct against Gutierrez, and of the sanctions imposed and threatened against him.

***Ex parte Young***

114. Gutierrez realleges and incorporates the foregoing factual allegations as if set forth fully herein.

115. "[F]ederal courts lack jurisdiction over suits against a state, state agency, or state official in his or her official capacity, 'unless that state has waived sovereign immunity from suit or Congress has clearly abrogated it.'" *Eriakha v. Univ. of Miss.*, 190 F.4th 453, 463 (5th Cir. 2026) (quoting *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015)). *Ex parte Young* is an "established exception" to this rule, *Mayfield v. Tex. Dep't of Crim. Just.*, 529 F.3d 599, 604 (5th Cir. 2008), that has long been "accepted as necessary to 'permit the federal courts to vindicate federal rights.'" *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254–55 (2011) (citation omitted).

116. Under *Ex parte Young*, sovereign immunity does not shield a state official sued "in his official capacity as long as the lawsuit seeks prospective relief to redress an ongoing violation of federal law." *Freedom from Religion Found. v. Abbott*, 955 F.3d 417, 424 (5th Cir. 2020); *see Media Matters for Am. v. Paxton*, 138 F.4th 563, 574–75 (D.C. Cir. 2025). Properly invoked, *Ex parte Young* renders the suit no longer "one against the State." *Doe v. Bonath*, 705 F. Supp. 3d 690, 704 (W.D. Tex. 2023).

117. For *Ex parte Young* to apply, an action must "(1) be brought against state officers who are acting in their official capacities; (2) seek prospective relief to redress ongoing conduct; and (3) allege a violation of federal, not state, law." *Freedom from Religion*, 955 F.3d at 424.

118. Each element is satisfied as to the UT System Board Defendants and the UTD Defendants. Each is a state officer sued in an official capacity. Gutierrez seeks injunctive and

declaratory relief concerning the ongoing enforcement of sanctions against him. And Gutierrez asserts a violation of the First Amendment through the Fourteenth Amendment.

119. *Ex parte Young* therefore applies, and sovereign immunity is unavailable to these defendants.

## Causes of Action

### COUNT ONE
### Violation of the First and Fourteenth Amendments
### As-Applied Challenge Free-Speech Violation (42 U.S.C. § 1983)
### Against the UT System Board Defendants and the UTD Defendants

120. Gutierrez realleges and incorporates the foregoing factual allegations as if set forth fully herein.

121. The First Amendment protects an individual's right to free expression. It applies "regardless of whether the government considers [the] speech sensible and well intentioned or deeply 'misguided,'" *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023), and especially when the government "disapprov[es] of the ideas expressed," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

122. The First Amendment's aegis extends to state-university campuses. *Widmar v. Vincent*, 454 U.S. 263, 268–69 (1981); *see Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

123. Gutierrez engages in protected expression when he publishes written work in journalistic publications such as The Mercury and The Retrograde. He does so as an author, editor, and steward of those publications.

124. By approving the disclaimer's inclusion in the Letter, Gutierrez engaged in expression protected by the First Amendment.

125. Defendants then investigated whether Gutierrez had discriminated against the Letter's author.

126. After investigating Gutierrez and conducting a disciplinary hearing, Defendants imposed sanctions on him—including, among other penalties, a deferred suspension—for approving the disclaimer's inclusion in the Letter.

127. The inclusion of the disclaimer was protected expression under the First Amendment. Defendants punished Gutierrez for that expression, thereby depriving him of constitutional rights.

128. Gutierrez specifically challenges the application of two policies: UTDBP3090 and § C, subsec. 9.6.15 of the Student Code of Conduct. The former "prohibits unlawful discrimination against a person because of their race, color, religion, sex (including pregnancy), sexual orientation, gender identity, gender expression, national origin, age, disability, genetic information, or veteran status," while the latter states: "Any student who engages in conduct that violates the Regents' Rules and Regulations, University rules and regulations, specific instructions issued by an administrative official of the institution or the UT System acting in the course of their authorized duties, or federal, State, or local laws is subject to discipline. A student is subject to discipline for prohibited conduct that occurs on or off campus, including but not limited to University or UT System sponsored off-campus activities such as field trips, internships, rotations, study abroad, or clinical assignments, regardless of whether civil or criminal penalties are also imposed for such conduct." Defendants sanctioned Gutierrez for national-origin-based harassment, which violates UTDBP3090, which in turn violates § C, subsec. 9.6.15 of the Student Code of Conduct.

129. Additionally, the UT System Board Defendants knew or should have known of the constitutional violations and failed to act. Section 3 of the Regents' Rules requires subordinate officials to report significant matters to the Regents—including matters that may substantially affect the institution's reputation. Gutierrez's case received widespread public attention and media coverage. FIRE also wrote to UTD, detailing the constitutional defects and demanding rescission of the suspension. The UT System Board Defendants therefore knew or should have known of the ongoing violations. Yet they did nothing to restrain or reverse their subordinates' actions.

130. As a legal consequence of the UT System Board Defendants' and UTD Defendants' violations of Gutierrez's First and Fourteenth Amendment rights, which are per se irreparable injuries, Gutierrez is entitled to judgment, declaratory relief, injunctive relief, and the reasonable costs of this action, including reasonable attorney's fees.

**COUNT TWO**
**Violation of the First and Fourteenth Amendments**
**As-Applied Challenge Free-Speech Violation (42 U.S.C. § 1983)**
**Against the UT System Board Defendants and the UTD Defendants**

131. Gutierrez realleges and incorporates the foregoing factual allegations as if set forth fully herein.

132. The First Amendment prohibits the government from abridging free speech, but the government "need not permit all forms of speech on property that it owns and controls." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992). The standard governing limitations on an individual's "right of access to public property" depends on "the character of the property at issue." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 44 (1983).

133. The Mercury was UTD's official student newspaper. *See* Student Media Bylaws, § 2.1(a) (Oct. 29, 2025), https://retrogradenews.com/wp-content/uploads/2026/04/FINAL-

102925.smbylaws.pdf. Accordingly, to determine the First Amendment scrutiny applicable to The Mercury, the nature of the "forum" must be identified.

134. The Mercury is a limited public forum. UTD opened The Mercury to "provide an opportunity for students to exercise Constitutionally protected freedom of the press and speech while simultaneously providing students an opportunity to develop skills and professional experience in communication and related fields." UTDPP1124, Committee on Student Media at 1 (Apr. 9, 2025); *see Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2001) (identifying limited public forums as "forums opened for public expression of particular kinds or by particular groups").

135. Because The Mercury was a limited public forum, expression could be restricted in or through The Mercury only if the restriction "(1) d[id] 'not discriminate against speech on the basis of viewpoint' and (2) [wa]s 'reasonable in light of the purpose served by the forum.'" *Chiu*, 260 F.3d at 346 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107 (2001)).

136. Gutierrez engaged in protected expression when he published written work in The Mercury. He did so as an author, editor, and steward of the publication.

137. By approving the disclaimer's inclusion in the Letter, Gutierrez engaged in protected expressive activity. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024) (reaffirming that intruding into the function of newspaper editors "interfered with the newspaper's 'exercise of editorial control and judgment'" and "violate[d] the First Amendment" (quoting *Mia. Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974))); *see also* Student Media Bylaws, *supra*, § 4.3(a) ("Primary responsibility for ensuring accuracy in statements of fact [in The Mercury] rests with those who write *and edit* the materials." (emphasis added)).

138. The UT System Board Defendants and the UTD Defendants exceeded the permissible limits on regulating a limited public forum by enforcing their policies against Gutierrez. The disclaimer—added through the editorial discretion afforded to an editor of The Mercury—became the subject of a UTD investigation based on a perceived viewpoint with which Defendants disagreed.

139. The inclusion of the disclaimer was protected expression under the First Amendment. Gutierrez was punished for that expression, thereby depriving him of constitutional rights.

140. Gutierrez was punished pursuant to the UT System Board Defendants' policies—promulgated through the Regents' Rules and implemented through UTD's Student Code of Conduct—and suffered the deprivation of his constitutional rights as a direct and proximate result of Defendants' enforcement of those policies against him.

141. Gutierrez specifically challenges the application of two policies: UTDBP3090 and § C, subsec. 9.6.15 of the Student Code of Conduct. The former "prohibits unlawful discrimination against a person because of their race, color, religion, sex (including pregnancy), sexual orientation, gender identity, gender expression, national origin, age, disability, genetic information, or veteran status," while the latter states: "Any student who engages in conduct that violates the Regents' Rules and Regulations, University rules and regulations, specific instructions issued by an administrative official of the institution or the UT System acting in the course of their authorized duties, or federal, State, or local laws is subject to discipline. A student is subject to discipline for prohibited conduct that occurs on or off campus, including but not limited to University or UT System sponsored off-campus activities such as field trips, internships, rotations, study abroad, or

clinical assignments, regardless of whether civil or criminal penalties are also imposed for such conduct." Defendants sanctioned Gutierrez for national-origin-based harassment, which violates UTDBP3090, which in turn violates § C, subsec. 9.6.15 of the Student Code of Conduct.

142. As a legal consequence of the UT System Board Defendants' and the UTD Defendants' violations of Gutierrez's First and Fourteenth Amendment rights, which are per se irreparable injuries, Gutierrez is entitled to judgment, declaratory relief, injunctive relief, and the reasonable costs of this action, including reasonable attorney's fees.

**COUNT THREE**
**Violation of the First and Fourteenth Amendments**
**First Amendment Retaliation (42 U.S.C. § 1983)**
**Against Moghe, Fitch, and Dieckmann**

143. Gutierrez realleges and incorporates the foregoing factual allegations as if set forth fully herein.

144. "[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. Riviera Beach*, 585 U.S. 87, 90 (2018); *see Rolf v. City of San Antonio*, 77 F.3d 823, 827 (5th Cir. 1996) ("[S]tate action designed to retaliate against and chill political expression strikes at the heart of the First Amendment.").

145. Before the Letter, Gutierrez—an author and editor of The Mercury—wrote and published works unfavorable to UTD and covered topics in ways the university disliked. Those actions and writings constituted expression protected by the First Amendment.

146. After The Mercury published the Letter, Gutierrez was removed from The Mercury, and an investigation into the discrimination allegations proceeded.

147. Gutierrez's removal and the subsequent investigation into him were pretextual: UTD alleged national-origin discrimination even though Steinberg's complaint concerned religion.

148. Moghe and Fitch (and Dieckmann, to the extent he acted as Fitch's delegee or agent) oversaw a sham investigation and disciplinary process. The evidence at the hearing showed that Gutierrez had not engaged in discrimination; he had exercised his freedom of expression.

149. UTD did not care. Gutierrez had written, edited, and published pieces unflattering to the university. Moghe and Fitch used baseless allegations of discrimination to silence him.

150. Moghe had every reason to want Gutierrez silenced. By his own account, Moghe's job includes securing the approval and trust of the Regents and the politicians in Austin. Gutierrez's reporting on the encampment, the law-enforcement raid, campus policing, and the administration's response undercut that objective. And Moghe knew, based on Eltife's statement at the Regents meeting, that the vote of confidence that "matters the most is the vote of [the Regents]." On information and belief, Moghe's desire to secure the confidence of the Regents and state officials motivated the retaliation against Gutierrez.

151. Gutierrez's expression caused his removal from The Mercury, the investigation concerning the Letter, the resulting sanctions, and the subsequent investigation. Moghe and Smith approved the sanctions and are responsible for enforcing them.

152. Through policies administered by Moghe and Fitch (and Dieckmann to the extent he acted as Fitch's delegee or agent), UTD has punished Gutierrez for exercising a constitutional right. The Constitution forbids that retaliation.

153. Moghe's and Fitch's violations of Gutierrez's First and Fourteenth Amendment rights (and Dieckmann's, to the extent he acted as Fitch's delegee or agent) constitute per se irreparable injury. Gutierrez asserts this cause of action against Moghe and Fitch (and Dieckmann, to the extent he acted as Fitch's delegee or agent) in their individual capacities and is entitled to

damages, declaratory relief, injunctive relief, and the reasonable costs of this action, including reasonable attorney's fees.

## Jury Demand

154. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution, Gutierrez demands a jury trial on all issues so triable.

## Prayer for Relief

WHEREFORE, Gutierrez respectfully requests that this Court award:

A. Judgment in favor of Gutierrez decreeing that Defendants' application of their policies violates Gutierrez's right to free speech under the First and Fourteenth Amendments to the United States Constitution;

B. Judgment vacating Defendants' discrimination determination against Gutierrez, rescinding the deferred suspension, rescinding the education sanction, and expunging Gutierrez's disciplinary record;

C. Judgment prohibiting the application of the policies under which Defendants unlawfully sanctioned Gutierrez because of the contents of the disclaimer and the editorial conduct in which he engaged—all constitutionally protected activity;

D. A declaratory judgment stating that Defendants' application of their policies violates Gutierrez's right to free speech under the First and Fourteenth Amendments to the United States Constitution;

E. A declaratory judgment stating that Moghe's and Fitch's acts toward Gutierrez constitute retaliation for expressive activities protected by the First and Fourteenth Amendments to the United States Constitution;

F. A preliminary and permanent injunction restraining the enforcement of Defendants' policies against Gutierrez in a manner violative of the First and Fourteenth Amendments to the United States Constitution;

G. Nominal damages for the violation of Gutierrez's First and Fourteenth Amendment rights from Defendants sued in their individual capacities;

H. An award of attorney's fees and costs under 42 U.S.C. § 1988 and other applicable law; and

I. All other further legal and equitable relief as the Court may deem just and proper.

Dated: November 23, 2026

**SBAITI & COMPANY PLLC**

*/s/ Griffin S. Rubin*
**Griffin S. Rubin**
Texas Bar No. 24121809
**Jonathan Bridges**
Texas Bar No. 24028835
3102 Maple Avenue, Suite 400
Dallas, Texas 75201
T: (214) 432-2899
F: (214) 853-4367
E: gsr@sbaitilaw.com
E: jeb@sbaitilaw.com

*Counsel for Plaintiff Gregorio Olivares Gutierrez*

## VERIFICATION

I, Gregorio Olivares Gutierrez, hereby affirm as follows:

1. I am over eighteen years of age and am competent to make this Verification.

2. I am the plaintiff identified in the foregoing Verified First Amended Complaint.

3. I have read the factual allegations in the foregoing Verified First Amended Complaint.

4. The factual allegations in the foregoing are, to the best of my knowledge and belief, true and correct.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 23, 2026.

Gregorio Olivares Gutierrez
Gregorio Olivares Gutierrez (Nov 23, 2026 23 35 49 CST)

Gregorio Olivares Gutierrez

# 261122 FAC_FINAL

Final Audit Report 2026-11-24

| | |
|---|---|
| Created: | 2026-11-24 |
| By: | Griffin Rubin (gsr@sbaitilaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAiLhIZLuB2_N9kFJQcwpeG34s0Zz0yJOp |

## "261122 FAC_FINAL" History

Document created by Griffin Rubin (gsr@sbaitilaw.com)
2026-11-24 - 5:29:15 AM GMT

Document emailed to Gregorio Olivares Gutierrez (gregolivares.04@gmail.com) for signature
2026-11-24 - 5:29:20 AM GMT

Email viewed by Gregorio Olivares Gutierrez (gregolivares.04@gmail.com)
2026-11-24 - 5:35:26 AM GMT

Document e-signed by Gregorio Olivares Gutierrez (gregolivares.04@gmail.com)
Signature Date: 2026-11-24 - 5:35:49 AM GMT - Time Source: server - Signature Appearance Selected: TYPE

Agreement completed.
2026-11-24 - 5:35:49 AM GMT